**In re John Peers ROBROCK, Debtor.**

**No. BKY 09–36740.**

United States Bankruptcy Court,
D. Minnesota.

May 21, 2010.

Colin Kreuziger, U.S. Trustee Office, Minneapolis, MN, for U.S. Trustee.

## ORDER GRANTING MOTION OF UNITED STATES TRUSTEE FOR DISMISSAL PURSUANT TO 11 U.S.C. §§ 707(b)(1)-(2)

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 7 case came on before the Court on April 20, 2010, for an evidentiary hearing on the motion of the United States Trustee for dismissal pursuant to 11 U.S.C. §§ 707(b)(1)-(2). The United States Trustee appeared by his attorney, Colin Kreuziger. The Debtor appeared personally and by his attorney, Chad J. Bolinske. The following decision is based on the evidence received at the hearing, and takes into consideration counsel's arguments on the law.[1]

### FINDINGS OF FACT[2]

1. The Debtor is a resident of Shakopee, Minnesota. He filed a voluntary petition under Chapter 7 on September 25, 2009.

Chad J. Bolinske, Bolinske & Bolinske PLLC, St. Louis Park, MN, for Debtor.

2. The Debtor is a physician in primary care (family practice). For the six months

---

1. The first matter addressed at the hearing was the U.S. Trustee's motion in limine. The U.S. Trustee had made requests for admission; the Debtor had not responded to them timely; and the U.S. Trustee sought to have the Debtor bound to them pursuant to FED. R.CIV.P. 36(b), *as incorporated by* FED R. BANKR.P. 9014(c). The Debtor's counsel prepared and served responses only after the U.S. Trustee's attorney announced his intention to make a motion in limine. But, he did not make a motion under Rule 36(b) for permission to withdraw or amend the deemed admissions. In the interests of ensuring a full and fair fact-finding process, the Court exercised its discretion in favor of the Debtor; the late responses were accepted. *See Quasius v.*

*Schwan Food Co.,* 596 F.3d 947 (8th Cir. 2010). Today's findings of fact reflect certain admissions that the Debtor affirmatively made in his tardy response, with or without qualification. The issues entailed in the balance of the requests for admission (i.e., those denied, late) are resolved by facts found on the evidence received at the hearing.

2. The following recitation includes only those facts that required evidence for their development, and that are directly relevant to the five legal issues posed by the parties. Various other facts—uncontroverted or stipulated-will be noted as appropriate in the later analysis.

prior to his bankruptcy filing, he was employed by Park Nicollet Health Services. He was still in that employment as of the date of the evidentiary hearing. On his Schedule I, the Debtor recited that he had had this employment for 18 years.

3. The Debtor is paid by his employer on a monthly basis, immediately after the end of the calendar month.

4. At the times relevant to this motion, the Debtor's compensation had three possible components:

a. a base salary, fixed at the beginning of the calendar year by the number of hours for which the Debtor was contracted to work, and requiring a specified number of "relative value units" associated with the time commitment [3];

b. an income supplement for additional duty assumed (usually supervising a medical student in a clinical placement), calculated on the "activity points" assigned to the type and amount of the duty performed; and

c. a sort of profit-sharing, based on the income and profitability status of the clinic at which the Debtor practiced, and awarded annually if the clinic "ran in the black" for the previous year.[4]

5. On a quarterly basis, the Debtor's paid compensation is adjusted according to his actual performance, against the productivity goals fixed by his annual contract. If the number of RVUs that he actually generates does not match the minimum prescribed by his contract, he undergoes a "salary reconciliation" in the following quarter. This is effected by a deduction in the amount otherwise payable to him as wages after the end of the adjusted quarter.

6. The Debtor receives the portion of his compensation that is generated by activity points once per year, immediately after the end of the first quarter. It is disbursed in a lump sum.

7. Over the six calendar months that ended on August 31, 2009, i.e., for work performed during the months of March—August, 2009, the Debtor earned total gross wages of $121,543.67 from Park Nicollet Health Services. The average per month from this figure is $20,257.68.[5] These gross and average amounts take

3. In the current parlance of health systems management, the acronym of "RVU" is used for this metric. RVUs are assigned in numbers to various types of physician-patient encounters. The process assumes standardized economic values for each type of service provision, regardless of the time actually put in on specific events with specific patients. This means of determining physician compensation is in wide current use in the primary care sector.

4. The Debtor testified that his employer had discontinued this component of physician compensation since the date of his bankruptcy filing. The reason was a perceived inequity between the situation of physicians working at suburban clinics like his—which are more likely to generate aggregate revenue greater than their costs of operation-and those employed at inner-city clinics—where the patient populations are more weighted toward Medical Assistance recipients, and where the practice generates materially less aggregate revenue due to lower reimbursement rates. The Debtor also testified that it was open to physicians employed by his clinic to "moonlight" at hospitals by doing patient admission or "rounding," on a voluntary basis on weekends or other off-hours. It is not clear whether this was an option for the Debtor during the six-month period relevant to this motion.

5. This finding is made via calculation from information on two documents in the record: a summary, prepared in the office of the U.S. Trustee and based on wage statements provided by the Debtor, received as Exhibit 3, and a "Pay Statement Summary" similarly based and prepared, received as Exhibit 12.

into consideration all of the miscellaneous, smaller earning components that were recited in the Debtor's pay statements.[6] They also incorporate the two adjustments for salary reconciliation that were actually applied to wages earned during the relevant six months, via deductions of $5,041.61 each from the pay disbursements made on August 3 and September 1, 2009.[7]

8. For the same six-month period, the average monthly total of amounts withheld from the Debtor's wages for pre-tax payment of health insurance premiums, plus $1.25 per month for "AD & D" (apparently accidental-death and dismemberment insurance coverage), was $557.68.[8]

9. Thus, considering only the transactions actually executed on payroll disbursements made for work performed during the six-month period from March 1 to August 31, 2009, the average monthly income that the Debtor received that was derived from employment during that period was $19,700.00. If one considers the third salary reconciliation event traceable to the second quarter of 2009 (that made against pay disbursed to the Debtor on October 1) as relevant to derived income, that six-month average is $19,417.01.

10. The Debtor's actual federal income tax liability on the monthly average income identified in the last sentence of Finding of Fact 9 would be $2,594.00, or very close to it. His Minnesota state income tax liability would be $790.00, or very close to it. His Social Security withholding would be $552.00 (the maximum under current law), and his Medicare tax obligation would be $274.00. The calculations for these conclusions assume a deduction claimable for federal and state income tax purposes for the full annual amount of the Debtor's spousal maintenance obligation to his ex-wife ($84,000.00), and the use of only one personal exemption ($3,650.00), plus the benefit of the standard deduction for one taxpayer filing singly ($5,750.00).[9]

6. These smaller items include an apparent reimbursement for the cost of cell phone service, and disbursements for "SUPPLMTL," "SAT CLIN," "GTL," and "PROCESS." Also, there were two larger disbursements on April 1 and September 1, 2009, for "QTR INCT." The meanings of these terms were not explained via evidence. The last item may signify Park Nicollet's now-discontinued analog to profit sharing for physicians.

7. Exhibit 12, which goes beyond the six-month period relevant under governing law, shows that the Debtor had two other salary reconciliation events over the 14 months from January, 2009 to March, 2010. In the payment disbursed on October 1, 2009, a third offset was made against his wages for September, again in the amount of $5,041.61. This clearly was the last adjustment on account of the Debtor's productivity experience during the second quarter of 2009. Exhibit 12 also shows a positive number for a salary recognition event during February, 2009 in the amount of $5,314.18. Apparently, Park Nicollet's direct productivity-based compensation measures for providers can go the other way.

8. The amount withheld for these items from the wages disbursed on September 1, 2009 was assumed to be $556.68, the amount actually withheld for five of the six previous wage disbursements. Exhibit 6 did not recite the components of this withholding for the wage disbursement on September 1, 2009, but did so for that of March 2, 2009. Apparently, the U.S. Trustee's methodology incorporated an assumption that the relevant income was that "received" during the six-month period delineated by the governing law, rather than the income "derived" during that period, regardless of date of receipt.

9. The analysis for these tax obligations uses the calculations performed by the U.S. Trustee's bankruptcy analyst in Exhibit 4 as a base; then, it attempts to arrive at a corollary figure after correcting for the one-month variance in the time period relevant under statute. The underlying IRS and Minnesota state tax tables are not in the record; so, technical, pin-point accuracy of the final components of income tax was not possible (i.e., the effect of bracketing on actual liability could not be ascertained with utter precision). To com-

11. Thus, the total of a maximum average monthly tax liability for the Debtor that would be due on his earnings from employment is approximately $4,210.00.

12. The Debtor's marriage to Brenda Marie Latham Robrock was dissolved under a judgment and decree entered in the Scott County, Minnesota District Court in early 2008. The judgment and decree was based on a marital termination agreement. For the dissolution proceeding, both parties ostensibly appeared *pro se*.[10] The relevant terms of the judgment and decree, and the parties' post-dissolution performance of them, were as follows:

a. The Debtor's ex-wife was awarded all interest in their marital homestead in Prior Lake, Minnesota. The Debtor was to provide her with a quit claim deed to transfer record title to her upon entry of the judgment and decree; however, she could "effectuate the transfer of title" to her by recording the judgment and decree or an abridgement of it if he did not. The Debtor's ex-wife was to indemnify and hold the Debtor harmless "from any financial obligation relating to the homestead including, but not limited to, principal, interest, taxes, insurance, maintenance and utilities." The reference here to principal and interest denoted two different debts, secured by first and second mortgages against the property. The Debtor's ex-wife was to "seek to refinance the underlying encumbrances in her own name as soon as she is qualified to do so and the new payment does not exceed the existing payment." She had not closed on any such refinancing, as of the date of the Debtor's bankruptcy filing. The total of payments on the two debts was approximately $4,300.00.

b. The Debtor was to assume full responsibility for the balances owing on four unsecured marital debts, of a total of $44,000.00. He was to indemnify and hold his ex-wife harmless from them. Per the Debtor's testimony, as of the date of the evidentiary hearing the total of the monthly payments was then about $600.00.

c. The Debtor's ex-wife was awarded spousal maintenance in the amount of $7,000.00 per month. The Debtor's obligation was terminable upon the death of either party, his ex-wife's remarriage, or further order of the court.

d. The Debtor and his ex-wife were to continue to hold title as tenants-in-common to a recreational property near Two Harbors, Minnesota, subject to certain prescribed terms of use. They were to share equally in

---

pensate for the inadequacies of the record, multiplier factors based on the ratios between Janovsky's originally-calculated tax amounts and his assumed monthly income (0.234157 for federal, 0.00713169 for state) were applied to the six-month average of income found at the end of Finding of Fact 9. Medicare tax was not assumed to be bracketed. The resulting numbers, for all of the categories other than Social Security tax, are different from (a bit smaller than) the U.S. Trustee's conclusions ($2,673.00 for federal, $814.00 for state, and $278.00 for Medicare taxes). The variant finding as to income results from a different approach to the beginning– and end-dates of the statutory six-month period, for the threshold calculation of average income received. *See* pp. 204-05, *infra*. The result is not perfect, but any variance from the actual, assessable liability under law is not material.

10. Documents filed in the state court recite that they had both consulted one "Merlyn L. Meinerts, attorney at law, as a scrivener only, but not as an attorney for either party."

the expenses of owning it, including mortgage payments and association dues, after any rental income was applied to the expenses. At all relevant times, the Debtor's half-share of the monthly mortgage payment and current association dues was $678.00. And, at all relevant times, the Debtor's ex-wife did pay her share, in that amount.

13. When the Debtor filed for bankruptcy, he owed $33,498.54 on a debt secured by a 2007 Chevrolet pickup truck. He used this vehicle for his own purposes.

14. On September 7, 2009, the Debtor extracted $50,000.00 from a 401K retirement account that he held through his employment. The transaction was nominally cast as a loan, payable within five years and with the outstanding balance bearing interest at 5.25% per year. When the Debtor filed for bankruptcy, the balance on this obligation was $30,360.27. The amortized monthly payment was $1,034.00.

## DISCUSSION

### I. The Governing Law

The U.S. Trustee makes his motion under 11 U.S.C. § 707(b)(1). This statute permits dismissal of a bankruptcy case under Chapter 7 where "the granting of relief [to a debtor] would be an abuse of the provisions of" that chapter. To make out his prima facie case, the U.S. Trustee relies solely on the presumption that operates "if the debtor's current monthly income reduced by the amounts determined under [11 U.S.C. §§ 707(b)(2)(A) ](ii), (iii),

and (iv), and multiplied by 60 is not less than the lesser of—

> (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or
> (II) $10,950."

11 U.S.C. § 707(b)(2)(A)(i).[11]

The calculation contemplated by this provision has become known as the "means test" for Chapter 7. *Fokkena v. Hartwick*, 373 B.R. 645, 648–649 (D.Minn.2007). *See also, in general,* Eugene R. Wedoff, *Means Testing in the New § 707(b)*, 79 AM. BANKR.L.J. 231 (2005). As part of an initial bankruptcy filing, an individual debtor is to go through the calculation and is to evidence his process via a written statement. 11 U.S.C. § 707(b)(2)(C). This is currently to be submitted on Official Form B22A.

"Current monthly income" ("CMI") is a defined term under the Bankruptcy Code: The term "current monthly income"—

> (A) means the average monthly income from all sources that the debtor receives ... without regard to whether such income is taxable income, derived during the 6–month period ending on—
>> (i) the last day of the calendar month immediately preceding the date of the commencement of the case ...;[12]
>> ... and
> (B) includes any amount paid by any entity other than the debtor ..., on a regular basis for the household expenses of the debtor or the debtor's dependents
> ...

11 U.S.C. § 101(10A).

The various reductions from CMI allowed by § 707(b)(2)(A)(i) and identified in

---

11. At the evidentiary hearing, the U.S. Trustee's counsel confirmed that the U.S. Trustee was not invoking 11 U.S.C. § 707(b)(3). That statute provides for dismissal on a finding of abuse from the "totality of the circumstances" of a Chapter 7 filing.

12. The Debtor did file his Schedule I, the "schedule of current income required by [11 U.S.C.] § 521(a)(1)(B)(ii)," so the balance of the verbiage of §§ 101(10A)(A)(i)-(ii) is irrelevant.

§§ 707(b)(2)(A)(ii)-(iv) are living expenses identifiable to the debtor and the debtor's dependents, specified by type. The allowable amount of particular living expenses is limited in the statute by one of three means. Most categories of expense are fixed by the prescriptions of certain Internal Revenue Service administrative guidelines used for tax collection procedures, which are incorporated by reference into the Bankruptcy Code, 11 U.S.C. § 707(b)(2)(A)(ii)(I).[13] Limitations for others are set numerically in the text of § 707(b)(2) itself, 11 U.S.C. § 707(b)(2)(A)(ii)(IV). The remainder of expenses allowable as reductions is to be limited via a reasonableness-and-necessity standard, judicially applied, 11 U.S.C. §§ 707(b)(2)(A)(ii)(II) and (V).

The U.S. Trustee's motion in this case implicates both stages of the calculation. The parties disagree over the calculation of the Debtor's CMI; and they have disputes over a number of the reductions from CMI that the Debtor used in his original means test submission. Though the number of the disputed reduction entries is small, the dollar-amount claimed by the Debtor for any individual one is large enough that the means test calculation could be thrown over to a result by the outcome of any of the actual issues posed.

## II. The Issues

Between them, the parties raise five issues. One goes to the income side of the means test; the other four go to reductions claimed by the Debtor on account of ostensible expenses.

### A. Calculation of Debtor's Current Monthly Income

For his case in chief, the U.S. Trustee relied on the testimony of Laddy Janov-sky, a certified public accountant employed by the United States Department of Justice as a bankruptcy analyst. Janovsky testified, clearly and in detail, to the process by which he applied the statutory concepts to the documentary proof of wage income that the Debtor had furnished to the U.S. Trustee, in order to establish the movant's position on the Debtor's CMI.

Janovsky's methodology erred in one respect, however, in its assumption as to the specific six months' worth of data to be input. There is no question that the months of March–August, 2009 make up the relevant period on the calendar; the Debtor filed his bankruptcy petition in mid-September, 2009, so the relevant six months ended on August 31, "the last day of the calendar month immediately preceding" the date of the filing. However, Janovsky used the components and total of the wages *disbursed* to the Debtor during those months, and only that; he did not consider the time of *accrual* at all. The statutory definition does require receipt by the debtor for inclusion of particular income in the calculus; but, the fact of receipt is only the threshold. Under the statutory language, includable income is fixed by a modifying participle—the amount of income *"derived" during* the six months is the input for the averaging process, regardless of the date of receipt. The statutory concept is logically understood as "income that *resulted from* employment *during* the relevant six month period even though the Debtor received the actual paycheck for that work after the end of the six month period." *In re Bernard,* 397 B.R. 605, 607 (Bankr.D.Mass. 2008) (emphasis added).

---

13. A good, evocative way of characterizing this legislative measure is that it "predetermine[s] expenses based on the debtor's income and household size and [does] not [allow] the debtor's actual expenses." *In re Ellringer,* 370 B.R. 905, 909–910 (Bankr. D.Minn.2007).

It is simple to correct for this minor misreading of the statute. One just deletes the income the Debtor earned in February, 2009 (as disbursed to him on March 2), and adds in the income earned during August, 2009 (as disbursed on September 1). This means that the bottom line of Janovsky's original calculation, per Exhibit 3, may not be streamed automatically into a finding. As it turns out, the preliminary result, i.e., the contractually-based earnings regularly received that were attributable to services performed, month-by-month within the relevant six months, is not that much different: the finding of $19,700.00, per Finding of Fact 9, versus $19,195.92 as Janovsky reckoned.[14]

In his pre-hearing submissions, the Debtor's counsel raised only one contention with the U.S. Trustee's determination of CMI, that it did not "include a recent $16,634.61 per month salary reconciliation which resulted from [his] failure to meet his monthly sales goals." The ultimate point of this statement was never articulated with any precision, between briefing and oral argument; but to the end counsel maintained his insistence that the U.S. Trustee was not giving the salary reconciliation proper weight, even as Janovsky was testifying to his use of at least one offset-event in his calculations.

■ In the end, it is not necessary to extensively deconstruct either this argument or the U.S. Trustee's original pre-hearing theory; Findings of Fact 7–9, including the content of n. 7, address the point and give the Debtor as much credit as the evidence warrants. Correcting the U.S. Trustee's legal error as to the months to be included brings in the remaining event of offset that was directly effected against wages that had accrued during the relevant six-month period, i.e., the second reconciliation-offset for the year. Then, it well-resonates with the concept of "income that results from employment during the relevant six month period," to further reduce the six-month gross total by the last amount offset, on October 1, 2009. That event of offset occurred after the six calendar months, but it finished the contractual rectification for a quarter's worth of earnings that fell entirely within the period. *See In re Bernard,* 397 B.R. at 607.[15]

This gets the amount of the Debtor's CMI traceable to his employment to $19,417.01. Contrary to the emotional, but unfocused thrust of the Debtor's argument, the figure is only about $337.00 less than the one on which the U.S. Trustee based his motion.[16]

■ And, another component must be added to the Debtor's wages, under the statutory definition: his ex-wife's monthly infusion of $678.00 into their common maintenance of the recreational property near Two Harbors, during the six-month period. The Debtor's counsel never spoke directly to the point, but it is obvious that the Debtor continued to make some use of

---

14. The substitution of the September 1, 2009 disbursement for that of March 2, 2009 meant that a quarterly incentive payment of $8,881.22 had to be added to the total. This augmentation was mostly offset by recognizing the second salary-reduction offset for the year ($5,041.61) in the calculation. The resultant increase of about $3,000.00 to the raw total of income pretty much accounts for the increase of about $500.00 in the first stage of calculation, on a monthly basis.

15. Under *Bernard's* rationale, it is irrelevant that the last salary reconciliation offset was executed against an earnings increment that had accrued after the end of the six months.

16. The comparison here is made with the entry for the "Debtor" column on line 11 of the U.S. Trustee's "Side by Side Comparison of Form B22A," an analytic summary received as Exhibit 2.

the property himself, and to bear his share of the debt service and association dues.[17] In consequence, it is entirely appropriate to deem the premises at Two Harbors part of the Debtor's "household," within the contemplation of § 101(10A)(B). Thus, the amounts that his ex-wife paid toward the ongoing debt service (on which the Debtor is jointly and severally liable) plus the association dues are a component of his CMI.[18] *In re Ellringer*, 370 B.R. at 910–912.

The total of the two components is $20,095.00, rounded. For the purposes of the U.S. Trustee's motion, this is the Debtor's CMI.

17. It is equally obvious that the Debtor himself must have been paying the costs he directly incurred to keep up a presence there, such as the expense of travel to and from, utility usage there, and the like. Under the statute, those do not factor at all into the means test.

18. The Debtor's counsel did not dispute the U.S. Trustee's position on any aspect of this point, on any ground or at any time.

19. A number of courts term the resulting surplus "disposable income." *E.g., In re Hartwick*, 373 B.R. at 648 (describing presumption of abuse under § 707(b)(2) as arising "if a mathematical formula set out in the statute ... yields a minimum amount of monthly disposable income."). Form B22A uses the same term, and the U.S. Trustee Program's standardized lexicon for argument on these matters does as well. As a strict matter of statutory nomenclature, this is not correct; § 707(b), and in particular §§ 707(b)(2)(A)-(B), do not contain the phrase "disposable income"; both prior to and after the enactment of BAPCPA, the term and its underlying notion were lodged in 11 U.S.C. § 1325(b), part of its "best efforts" test for confirmation of a plan under Chapter 13. Conceptually, however, the cross-use of the term is a near-match. Since BAPCPA, disposable income under § 1325(b) is determined by starting with the debtor's CMI (as defined in § 101(10A)), then deducting the expense items identified in §§ 707(b)(2)(A)-(B), plus 11 U.S.C. §§ 1325(b)(2) and 1325(b)(3). One dif-

## B. Contested Reductions for Expenses

Once CMI is identified, the means test proceeds through a lengthy list of entries for the reduction of CMI down to an amount deemed to be available for payment on debt.[19] As noted earlier, there is no dispute in this case over the majority of these items.[20]

Originally, the U.S. Trustee raised four points of objection to the reduction items on the Debtor's means test submission on Form B22A.[21] One was resolved between the preliminary and evidentiary hearings on the motion. At entry 23.b. of his original Form B22A, the Debtor claimed the

ference, however, is that disposable income under § 1325(b) is net of "any amounts required to repay [a] ... loan" from a 401K plan account or similar benefit, 11 U.S.C. § 1322(f), while there is no statutory authorization for this reduction under §§ 707(b)(2)(A)(ii)-(iii). *See* pp. 209-10, *infra.*

20. In deeming a debtor's expense amounts as fixed in amount regardless of actual experience, via the statute's exclusive incorporation of administratively-calculated IRS guidelines, the means test perforce takes the real-life details of any debtor's life right out of the picture. This was Congress's intent. *E.g., In re Washburn*, 579 F.3d 934, 940 (8th Cir. 2009) (noting, as to incorporation of IRS standards for household expenses into means test of § 707(b)(2), "the Congressional intent of limiting the courts' ability to allow expenses...."); *In re Frederickson*, 545 F.3d 652, 658 (8th Cir.2008) ("In enacting BAPCPA, Congress reduced the amount of discretion that bankruptcy courts previously had over the calculation of a[] ... debtor's income and expenses."); *In re Ellringer*, 370 B.R. at 913.

21. The U.S. Trustee based the theory of this motion on the content of the Form B22A that the Debtor submitted with his original bankruptcy filing. The Debtor filed an amended Form B22A on January 11, 2010; it is obvious that this was done in response to the motion. The analysis will consider the recitations on both documents.

full amount of the scheduled monthly payment on the financing for his Chevrolet truck. But, in the end he conceded to the U.S. Trustee's position that 11 U.S.C. § 707(b)(2)(A)(iii) required the figure to be calculated by simply dividing the outstanding principal balance on the debt as of the date of the Debtor's bankruptcy filing, by 60.[22] Under the parties' accord, the amount of this line entry is $555.33.

Between the three remaining from the U.S. Trustee's argument and an additional item that the Debtor injected into the controversy, four points of contention were presented for decision.

### 1. Mortgage Payments Owing, as to Debtor's Former Marital Homestead

■ At line 20B.b., "Average Monthly Payment for any debts secured by your home," the Debtor claimed a reduction of CMI in the amount of $4,300.00 in his original Form B22A. He increased the claimed amount to $5,087.00 in his amended Form B22A.[23] This entry signified the payment obligation on the two mortgage-secured debts chargeable against the home in Prior Lake, Minnesota, that was awarded to the Debtor's ex-wife in the dissolution proceedings.[24]

The Debtor has no basis in law to claim this as a reduction from CMI for the means test, however. Whether this alleged expenditure is rationalized under § 707(b)(2)(A)(iii)(I) (as an "amount[ ] scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition") or § 707(b)(2)(A)(iii)(II) (as a "payment[ ] to secured creditors necessary for the debtor . . . to maintain possession of the debtor's primary residence . . . or other property necessary for the support of . . . the debtor's dependents"), it must first be a "payment[ ] on account of *secured* debt[ ]." 11 U.S.C. § 707(b)(2)(A)(iii) (emphasis added).

As the U.S. Trustee points out, the Debtor's current obligation on this account does not qualify as a "secured debt" in bankruptcy. The Debtor's counsel made much of the fact that the Debtor had not yet been released of his personal liability to the original mortgage lenders. That can not be gainsaid; there are still "debts" running from the Debtor to the two lenders within the contemplation of the Bankruptcy Code.[25]

But, the rights of the two lenders are not cognizable as "*secured* claims" in bankruptcy, and thus the Debtor's liability to them is not a "*secured* debt":

---

**22.** In pertinent part, the cited statute provides:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—
> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

**23.** This claimed reduction was in addition to a claimed expense of $1,099.00 under line 20B.a., "IRS Housing and Utilities Standard; mortgage/rental expense." Under the sense of the means test, the latter was the Debtor's deemed expenditure for his own living space.

**24.** Neither party produced documentary evidence going to the actual amount of the two payments; and the Debtor did not produce any evidence to explain the difference between the entries on the two Forms B22A.

**25.** "Debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). "Claim" is defined as "right to payment." 11 U.S.C. § 101(5)(A).

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). The "property in which the [bankruptcy] estate has an interest" is the property that the Debtor held as of the date of his bankruptcy filing; all such property rights passed into and became part of his bankruptcy estate by operation of 11 U.S.C. § 541(a)(1). But, this did not include any legal or equitable property interest in the home in Prior Lake; the Debtor had been divested of all interest in the property by operation of the divorce decree, a year and a half earlier.[26]

So, the ongoing liability on the two debts chargeable against the property is not "secured debt" in the context of this case. The Debtor is not entitled to reduce his CMI on account of his now-unsecured liability on them. In his testimony, the Debtor voiced a vague personal motivation to pay, in the nature of a "moral obligation" to make good on them if his ex-wife can not; but that is legally irrelevant.[27]

## 2. Calculation of Debtor's Income Tax Liability for Means Test

■ The parties' dispute on line entry 25, "Other Necessary Expenses: taxes," is simply summarized. In his amended Form B22A, the Debtor claimed $6,478.00 for this expense. This was intended to correspond in some way to an amount actually withheld from the Debtor's wages.[28] In his testimony, though, the Debtor admitted having received income tax refunds for several years previous, including a total of about $8,000.00 in refunds for tax year 2009.[29]

Prompted by the actual occurrence of overwithholding on the Debtor's part, the U.S. Trustee's analyst computed the most likely amount of an actual average monthly income tax liability for the Debtor on the

26. The parties stipulated that the Debtor had not yet executed a quit claim deed to formally transfer record title to his ex-wife; and, apparently, the divorce decree has not been filed for record. Nonetheless, the entry of the divorce decree alone was effective to transfer all of the Debtor's right, title, and interest in the property to her. *Thomson v. U.S.*, 66 F.3d 160, 163 (8th Cir.1995) (applying Minnesota law). *See also Thompson v. Stevens*, 1996 WL 706835 (Minn.Ct.App.1996) (unpublished).

27. This latter reference is made to address an alternate theory that the Debtor's attorney made in briefing and opening argument. The articulation was less than coherent, but it apparently was advanced to reflect the Debtor's feeling that he should preserve "my house," apparently for the benefit of his three minor children, and that one or both of the mortgage lenders could sue him for any unsatisfied balance of the debt post-foreclosure. None of this had anything to do with the hard-and-fast of the means test. And, to the extent that the Debtor's counsel was trying to build the argument on § 707(b)(2)(A)(iii)(II), there was no evidence to establish that the Prior Lake house was still "the Debtor's primary residence." (To the contrary, the documents in the Debtor's initial filing gave two different addresses for him, neither of which lay in Prior Lake; and there is nothing in the record to defeat an inference that his ex-wife had sole possession and exclusive use of the property at all relevant times.)

28. Neither the briefing, the oral argument, or the record at the hearing ever tied this specific number back into corroborating documentary evidence, or even the Debtor's testimony.

29. This finding is imprecise, but it is all that the evidence (the Debtor's terse testimony alone) can support. The Debtor never produced his 2009 returns for the U.S. Trustee, in informal or formal discovery; and he did not offer copies of that year's returns into evidence.

average derived earnings in those months. He made most of the assumptions as to input variables in the Debtor's favor (i.e., so as to maximize the amount of the calculated liability).[30] The figure Janovsky reached, $4,316.72, was significantly less than that argued by the Debtor. However, the Debtor produced no evidence at all to contradict the assumptions imposed by Janovsky on his inferences from all the documentation that the Debtor had provided to the U.S. Trustee. Thus, Janovsky's methodology was used; and, with some minor arithmetical adjustments, the resulting total liability of $4,210.00 is reflected in Findings of Fact 10–11 and associated n. 9.[31]

This does not dispose of the issue, however, because it comes down to one of law. As to that, the several courts that have addressed the issue have unanimously concurred with the U.S. Trustee's position. *E.g., In re Meade,* 420 B.R. 291, 311 (Bankr.W.D.Va.2009); *In re Bernard,* 397 B.R. at 608–609; *In re Hale,* 2007 WL 2990760, at *2 (Bankr.N.D.Ohio 2007). Their reasoning is sound, and the Debtor's counsel's argument is not.

On the record, only one finding is defensible. The amount of the Debtor's tax liability to be factored into the means test at line 25 is $4,210.00.

## 3. Payments to Address Past Withdrawal from 401K Account

█ Via line 56 on his amended Form B22A, "Other Expenses," the Debtor sought to further reduce his CMI by the amount of the payment he was making via payroll deduction to redress the withdrawal of $55,000.00 that he made from his account in his employer's 401K plan just before his bankruptcy filing. The entry recited $1,034.00 as the amount of the payment. The U.S. Trustee maintains that this type of disbursement is not an appropriate expense under § 707(b)(2)(A)(ii)(I). He argues that the backdrop transaction can not be characterized as a "loan" or extension of credit at all, and the payment of funds back into a 401K account is merely the reconstitution of a value for an asset that was drawn down by a past withdrawal.

The response from the Debtor's counsel was quite conclusory, to the effect that the Debtor "is required to pay that back by his employment," and that this alleged lack of an option to defer the re-funding of the account makes the amount of the payment "an allowed deduction." He did not produce any evidence, such as a summary plan description, that would support his legal characterization of the Debtor's alleged obligation, however.

---

**30.** For instance, Janovsky did not factor in a claim of personal exemptions on account of the Debtor's dependent children, even though he thought the Debtor could claim them as well as head-of-household filing status. Janovsky also assumed a standard deduction rather than itemization. (The latter assumption seems well-founded. The Debtor would not have the advantage of the potentially-largest federal income tax deductions available to a wage earner: his bankruptcy schedules do not disclose any ownership of homestead real estate, ruling out a deduction for mortgage interest, and the Debtor's amended Form B22A recites an average charitable contribution of only $40.00 per month.)

**31.** In testimony and in closing argument, the Debtor and his attorney insisted that Janovsky's conclusions could not possibly be accurate as a measure of a tax liability actually to be assessed against the Debtor, because the amount of the refunds for 2009 that he had received was much less than would be implicated by Janovsky's results against the Debtor's total withholding for the year. Without the actual returns and their associated Forms W–2 in evidence, there is nothing to give support or credence to this argument.

# 210

Most all of the courts to address this issue have supported the U.S. Trustee's analysis, that this sort of obligation is not a "debt" at all for the purposes of § 707(b)(2), let alone a secured debt within the scope of § 707(b)(2)(A)(iii). E.g., *In re Egebjerg*, 574 F.3d 1045, 1049 (9th Cir. 2009); *McVay v. Otero*, 371 B.R. 190 (W.D.Tex.2007); *Eisen v. Thompson*, 370 B.R. 762, 768 (N.D.Ohio 2007); *In re Harrison*, 2010 WL 398975 (Bankr.M.D.N.C. 2010); *In re Smith*, 388 B.R. 885, 887–888 (Bankr.C.D.Ill.2008); *In re Mowris*, 384 B.R. 235, 237–238 (Bankr.W.D.Mo.2008); *In re Turner*, 376 B.R. 370, 375–376 (Bankr.D.N.H.2007).[32] Over this line of authority, the predicate characterizations are accurate and the reasoning is sound. There is no extant case law to the contrary. The courts' uniform construction of § 707(b)(2)(A)(iii) in this application fully supports the disallowance of this claimed "expense"; it may not be used to reduce the Debtor's CMI for the means test.

### 4. The Debtor's Payment on Credit Card–Related Debt, as Imposed by the Divorce Decree

█ In response to the U.S. Trustee's motion—and only via oral argument and testimony—the Debtor insists that the monthly payments he is making on three pre-divorce, unsecured credit card accounts should also be applied to his benefit in the means test. It does not appear that the Debtor even used these payments as an expense or other reduction from CMI in his original or amended Forms B22A. For the sake of completeness, the argument will be addressed.

And, it is not worthy of more than a summary rejection. In the first place, payments on any debt (secured or unse-

cured) do not qualify as an "expense": "Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts." 11 U.S.C. § 707(a)(2)(A)(ii)(I). In the second, only payments on *secured or priority* debts may be factored in to reduce CMI as non-expense items. 11 U.S.C. §§ 707(b)(2)(A)(iii) and (iv). There simply is no basis under the pin-point, fussily specific prescriptions of the statutes to allow a payment on an unsecured debt as a reduction from CMI.

### C. Outcome of Means Test Calculation

With those four issues all decided against the Debtor, the bottom line of the means test calculation differs from the U.S. Trustee's proposal by only a few dollars. The difference is attributable to the spread between the total of CMI found at p. 11 from the number maintained by the U.S. Trustee at line 12 in Exhibit 2, and the spread between the associated tax liabilities. Since there is no change in any of the factored expenses or other reduction items from that proposed by the U.S. Trustee, the bottom-line determinations of "Monthly disposable income under § 707(b)(2)," line 50, and "60–month disposable income under § 707(b)(2)," line 51, differ by only the same, like measure: $1,632.12 is the resulting monthly figure, and $97,927.20 is the total of 60 months. Those figures are now found as a matter of fact, for the means test applicable to the Debtor in this case.

### D. Operation of Presumption of Abuse

The 60–month total exceeds both of the thresholds identified numerically in 11 U.S.C. § 707(b)(2)(A)(i).[33] Thus, "the

---

**32.** In his responses to the U.S. Trustee's requests, the Debtor admitted that his own repayment obligation was "not a secured debt." But his counsel still insisted that the amount

of the monthly payment was a proper reduction of CMI.

**33.** The parties stipulated that the Debtor scheduled a total of "$85,281 in general unse-

court shall presume abuse exists." § 707(b)(2)(A)(i). This makes out a prima facie showing for the dismissal of this case. § 707(b)(1).

The operation of a presumption "imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption ..." FED.R.EVID. 301. Tracking the specificity of factors prescribed as relevant to the existence of abuse under the presumption, Congress has severely limited the latitude of debtors in rebutting the presumption.

First,

... the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

§ 707(b)(2)(B)(i).[34] This provision has been described as setting a "bar extremely high, placing it effectively off limits for most debtors." *In re Rieck*, 427 B.R. 141, 146 (Bankr.D.Minn.2010) (citation and interior quotes omitted). The statute's two gratuitous reference-examples only confuse the issue and may be set aside. The focus must be on the statute's prescription for the ultimate showing to rebut the presumption:

The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in

clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of—

(I) 25 percent of the debtor's nonpriority unsecured claims, or $6,000, whichever is greater; or

(II) $10,000.

§ 707(b)(2)(B)(iv). This provision builds out the statutory concept of presumptive abuse; in effect, it makes the presumption irrebuttable for debtors who have a 60–month cumulated total of CMI, adjusted for the various statutory reductions, that is greater than the specified percentage-component of their debt structure, or than the alternative specified dollar-amounts.

Finally, the statute prescribes the nature and quality of proof required to rebut the presumption:

(ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide—

(I) documentation for such expense or adjustment to income; and

(II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

(iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional ex-

---

cured debt," i.e., "nonpriority unsecured claims" in the statute's parlance. 25 percent of that amount is $21,320.25. Put another way, in the contemplation of the means test the Debtor could pay his scheduled unsecured debt in full over a 60–month period, assuming no further interest accrual as would be the case via a plan under Chapter 13.

**34.** The inclusion of the word "that" in the ending clause of this sentence is puzzling. It only makes the clause ungrammatical; but more importantly, it adds no further meaning to the apparent thought behind the provision. To make any sense at all, the clause must be read as using "special circumstances" as its subject and "justify" as its verb, with the superfluous, interplaced "that" to be ignored.

penses or adjustments to income are required.

§§ 707(b)(2)(B)(ii)-(iii).

Neither side argued any significant analysis on the application of these provisions. The Debtor did not present any evidence that could be considered responsive to them. The Debtor's failure to do so as a formal matter is particularly curious, because the statute allocates the responsive burden of production entirely on him. But, as a result, it is not necessary to build out much further analysis to apply these provisions to the Debtor's evidentiary showing. Most all of the relevant thoughts emerged in the previous discussion.

To the extent that the several large reduction factors were legally cognizable in a case for rebuttal, it was incumbent on the Debtor to convince the Court that they were "necessary and reasonable," in character and amount, and that he had "no reasonable alternative" to paying them. *In re Rieck,* 427 B.R. at 145–47 (means cited in statute is the "only . . . way to rebut the presumption of abuse"). He failed to do that as to all of them:

1. As between him and his ex-wife, the Debtor is not obligated to make payments on the two debts chargeable against his former homestead. More to the point, he is not even paying them de facto. In the general structure of the divorce decree, the de facto burden of these payments was subsumed into his obligations for spousal maintenance and child support. The benefits of occupancy and ownership of the property are entirely his ex-wife's now; so are the immediate, tangible risks and consequences of nonpayment on the mortgages, i.e., loss of a place of residence. Even if the Debtor were making a separate, discrete payment on the debts, apart from his payments of family support, it could not be termed "reasonable" or "necessary" *to him,* legally or factually. His lawyer tried to contort the abstraction of a surviving liability on the underlying debt, into a personal expense of the Debtor's own; but this was pure artifice.

2. The parties' differing positions on the Debtor's income tax liability do not bear at all on rebutting the presumption under the statute's own terms; it was merely a matter of the amount of an allowable reduction from CMI. This is a matter of simple logic.

3. The Debtor completely failed his burden of production of evidence on the alleged necessity that he recharge the balance in his 401K account via current monthly payments.

4. The full tenor of the means test is that payments on unsecured debt are not to be considered at all as reductions to CMI. In any event, the Debtor failed to structure a case, by evidence or argument, as to how continuing the payments on the four credit card accounts was "necessary" to him.

The Debtor failed to rebut the presumption that had been triggered by the U.S. Trustee's proof. On the record for this motion, there is only one outcome.

### ORDER

The U.S. Trustee having proved that allowing the Debtor relief under Chapter 7 would be an abuse of that's chapter's remedies.

IT IS HEREBY ORDERED that this case is dismissed.