FILED

U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

October 8, 2014

Blaine F. Bates
Clerk

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

IN RE VEDE JACOB MILLER, also known as Jake Miller,

Debtor.

BAP No.   WY-14-002

VEDE JACOB MILLER,

Appellant,

v.

UNITED STATES TRUSTEE,

Appellee.

Bankr. No.   13-20384
Chapter   7

OPINION

Appeal from the United States Bankruptcy Court
for the District of Wyoming

Submitted on the briefs:[*]

Brad T. Hunsicker of Winship & Winship, P.C., Casper, Wyoming, for Appellant.

Ramona D. Elliott, Deputy Director/General Counsel (P. Matthew Sutko, Associate General Counsel, and Robert J. Schneider, Jr., Trial Attorney, with her on the brief) Washington, D.C., and Patrick S. Layng, United States Trustee for Region 19 (Daniel J. Morse, Assistant United States Trustee, with him on the brief), Cheyenne, Wyoming, for Appellee.

Before NUGENT, KARLIN, and SOMERS, Bankruptcy Judges.

KARLIN, Bankruptcy Judge.

The issue we face is whether a debtor's wages need to be both earned and

---

[*]     The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. Bankr. P. 8012. The case is therefore ordered submitted without oral argument.

received during the applicable six-month "look-back" period in order to be included as part of his "current monthly income" under 11 U.S.C. § 101(10A). Debtor Vede Jacob Miller ("Miller") timely appealed the bankruptcy court's order dismissing his Chapter 7 petition after the court determined that, when properly calculated, Miller's current monthly income ("CMI") disqualified him from proceeding under Chapter 7 of the Bankruptcy Code.[1]  When Miller declined to convert his bankruptcy case from Chapter 7 to Chapter 13, the bankruptcy court dismissed his petition.  We affirm the dismissal.

I.    BACKGROUND

The relevant facts are undisputed.  Miller filed his Chapter 7 bankruptcy petition in April 2013.  He claimed the § 707(b) presumption of abuse did not apply to his bankruptcy filing, under § 707(b)(7)(A), which effectively exempts a filer from the presumption of abuse if his income is less that the median income for his state and family size.  When Miller filed his bankruptcy, he was paid bi-weekly (26 times annually) and reported gross annual income of $77,705 and $81,066 in 2011 and 2012, respectively.  When he filed, the median income for a family of three in Wyoming was $73,688; it was $78,733 for a family of four.

Miller's first Form B22A (the Chapter 7 means test) listed a family size of 3 and a CMI of $4,977, resulting in a calculated annual income of $59,721.  Three months later, Miller filed an amended B22A form, this time claiming a family size of 4 and a CMI of $6,112—$73,338 annually, still $300 below Wyoming's median income for a family of three.  The figure was also $5,395 less than the $78,733 median income for a family of four, the family size Miller claimed on the amended form.[2]

---

[1]    Unless otherwise indicated, all statutory references in this decision will be to the Bankruptcy Code, Title 11 of the United States Code.

[2]    The UST suggests that Miller changed his family number from 3 to 4

(continued...)

The United States Trustee (UST) contested Miller's CMI calculations, which Miller based on his understanding of the term "current monthly income," as defined in § 101(10A). That definition includes, "income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period." Miller argued that the "derived during" language means "earned during," such that his CMI only need include income he both received **and earned** during the look-back period.[3] The UST read the definition to include all money received during the look-back period, regardless when it was earned.

These differing definitions led the UST and Miller to dispute the inclusion of one payment, which Miller received on October 10 in the amount of $2,942. Those wages were in compensation for work he completed in the two weeks before commencement of the look-back period—the "10/10 payment."[4] Eliminating this payment from Miller's CMI calculation reduced his annualized

---

[2] (...continued)
because his income otherwise would have exceeded the Wyoming median annual income, even using his calculation. Brief of Appellee Patrick S. Layng, United States Trustee, at 8. The UST argument is inaccurate. Miller's amended calculation reflecting annual income of $73,338 was still below the $73,688 median income for a family of 3 in Wyoming at the time his petition was filed. http://www.justice.gov/ust/eo/bapcpa/20130401/bci_data/median_income_table.htm. Printed copies of this, and all other webpages cited herein, are provided as an attachment located at the end of this decision. The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the Opinion of the Court.

[3] The defined look-back period was October 1, 2012, through March 31, 2013.

[4] The UST's analysis of Miller's pay advices indicates that the pay period covered by the 10/10 Payment was September 14-30, a period of 17 days. *See* Appellant's Appendix ("Appx") at 67. Each of Miller's other checks covered a 14-day period that ended 10 days prior to the payment date. As the 10/10 pay advice is not contained in the appellate record, the Court assumes the UST's stated pay period is simply a transcription error.

income to nearly $6,000 below the Wyoming annual median for a family of four. But when the UST included that payment, Miller's income placed him at above-median income status. As a result, Miller's CMI would have resulted in Miller having to repay (under a 60-month repayment plan required of above median income debtors) approximately $42,000 to his unsecured creditors. Since he listed total non-priority unsecured debt of $58,062, creditors would have potentially received payment of more than 70% of their claims.

Based on this calculation, the UST filed a Statement of Presumed Abuse pursuant to §§ 707(b) and 704(b)(2),[5] and a motion to dismiss Miller's case pursuant to § 707(b)(2) and (3).[6] Miller then filed his own motion for partial summary judgment, claiming that because the 10/10 payment should be excluded, he should be allowed to proceed in Chapter 7.

The bankruptcy court agreed with the UST interpretation, holding that all income received by a debtor in the look-back period must be included in the calculation of CMI "without relation to when that income was earned."[7] As a result, the bankruptcy court dismissed Miller's case pursuant to § 707(b)(2)[8] when he declined to convert to a Chapter 13 proceeding.

II.    APPELLATE JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit,

---

[5]    *See* Appx at 59.

[6]    *Id.* at 60. Section 707(b)(2) is based on a presumption of abuse that arises from a mathematical calculation of income and expenses, whereas § 707(b)(3) requires a showing of bad faith but does not require the trustee (or other party in interest) prove that the debtor exceeded the abuse threshold.

[7]    Opinion on Motion for Partial Summary Judgment at 7, *in* Appx at 131.

[8]    As a result, the bankruptcy court did not reach the UST's § 707(b)(3) bad faith claim against Miller.

unless one of the parties elects to have the district court hear the appeal.[9]  A decision dismissing a bankruptcy case is a final order for purposes of appeal.[10]

Miller timely appealed the bankruptcy court's dismissal of his case as well as the order denying him summary judgment.[11]  Neither party elected to have the appeal heard by the district court, and the parties have therefore consented to appellate review by this Court.

### III.    ISSUE AND STANDARD OF REVIEW

**In calculating CMI pursuant to § 101(10A), is income that was earned before the start of the six-month look-back period included if it is received during that period?**

The sole issue on appeal requires us to interpret a statute, a question of law that we review de novo.[12]

### IV.    DISCUSSION

Under § 707(b)(1), "the court . . . may dismiss a case . . . or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter."  Section 707(b)(2) sets out a means test that creates a presumption of abuse in many cases, but § 707(b)(7)(A) effectively exempts a debtor from the

---

[9]    28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002; 10th Cir. BAP L.R. 8001-3.

[10]    *In re Miller*, 383 B.R. 767, 770 (10th Cir. BAP 2008) (order of dismissal is generally final and appealable under 28 U.S.C. § 158(a)).

[11]    The UST suggests that 10th Cir. BAP L.R. 8001-1 required Miller to pay two filing fees in order to appeal both the order denying his motion for partial summary judgment and the order dismissing his case.  This local rule is interpreted to require separate notices of appeal from separate *final* orders, which the December 5 order was not.  Moreover, an appellant may seek review of all interim, non-final orders in conjunction with an appeal of the final order resolving the case.  *See Koch v. City of Del City*, 660 F.3d 1228, 1237 (10th Cir. 2011), *cert. den.*, 133 S.Ct. 211 (2012) (interlocutory orders merge into a final judgment and are reviewable on appeal).

[12]    *In re Woods*, 743 F.3d 689, 693 (10th Cir. 2014); *In re Ford*, 574 F.3d 1279, 1282 (10th Cir. 2009).

means test presumption of abuse "if the current monthly income of the debtor . . . and the debtor's spouse combined . . . when multiplied by 12, is equal to or less than" the median income for the debtor's family size in the applicable state. The term "current monthly income" is defined in § 101(10A) as follows:

> (10A) The term "current monthly income"–
> (A) means the average monthly income from all sources that the debtor *receives* (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, *derived during the 6-month period* ending on–
> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii)
>
> (emphasis added).

The parties offer differing interpretations of the term "current monthly income." Miller reads "derived during" to mean "earned during." As a result, he reads § 101(10A) to include only income that he both received and earned during the 6-month look-back period. In other words, he contends the statute excludes both income received in the look-back period that he earned outside of that period and income he earned during the look-back period for which he received payment outside of it. The UST contends that all income received during the look-back period must be included in the calculation of CMI, regardless when it was earned.[13]

The Tenth Circuit Court of Appeals has not considered this issue, and our independent research has produced no other appellate decisions addressing the meaning of this language. We are thus left to interpret the Code in the first instance. "[I]nterpretation of the Bankruptcy Code starts 'where all such inquiries

---

[13] The UST agrees with Miller that income earned in the look-back period— but received outside of that period—is not included in CMI (such as Miller's April 10, 2013 pay).

must begin:  with the language of the statute itself.'"[14]  "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"[15]  Further, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[16]  "If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute."[17]

The most common definition of "derive" is "to take, receive, or obtain especially from a specified source,"[18] and both parties rely on this definition.[19] But this definition is actually defining the phrase "derive from."  Using the term "derive," as outlined in these definitions, requires the preposition "from."  But Congress did not choose the phrase "derived from;" instead, it used the term "derived" in a temporal setting, that is, "derived during."  And a dictionary definition analogous to the one for "derived from" for the phrase "derived during" would read as follows:  "to take, receive, or obtain, especially during a specified period."  Using this definition in the statute, then, the primary dictionary meaning leads us to read "income derived during the look-back period" as "income taken, received, or obtained during the look-back period."  The meaning of the terms

---

[14]  *Ransom v. FIA Card Servs.*, N.A., 562 U.S. 61, 131 S.Ct. 716, 723 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

[15]  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

[16]  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

[17]  *United States v. Manning*, 526 F.3d 611, 614 (10th Cir. 2008) (citation and internal quotation marks omitted).

[18]  *See, e.g.*, Merriam-Webster Online Dictionary, http://www.merriamwebster.com/dictionary/derive.

[19]  *See* Appellant's Brief at 11-12.

"taken" and "obtained" are subsumed in the broader term "received,"[20] so we read the definition of "income derived during the look-back period" as "income received during the look-back period." This appears to be the plain meaning of the statute.

Admittedly, construing the words "derived during" to be essentially synonymous with the word "received" presents a statutory interpretation challenge, given that Congress used the word "receives" earlier in the same sentence. If the legislature intended the words to have the same meaning, why would it use different words?

Miller makes just this argument, asserting that "if different language is used in different parts of a statute, then a court should presume the legislature intended a different meaning and effect with respect to each term."[21] This argument appears to rely on the idea that courts should not read a statute to render any portion of the statute redundant, and reading dissimilar terms to mean the same thing risks creating redundancy. But there is little precedential support for the alleged rule that different words must have different meanings.

The United States Supreme Court has specifically recognized that Congress's use of two different terms in a statute does not preclude the courts assigning the terms the same meaning, noting that Congress may have used the terms, "not as contrasting, but as synonymous or alternative terms."[22] And even if

_____

[20] If one takes or obtains money, one still receives that money; the terms simply provide additional information about how that money is received.

[21] Appellant's Brief at 12.

[22] *Wachovia Bank v. Schmidt*, 546 U.S. 303, 314 (2006) (in reference to the words "located" and "established" in a statute). Congress certainly does use synonyms in its drafting, and courts should not strain to interpret words differently when their ordinary meaning is synonymous. Thus, the rule against superfluities cannot be used to override the "fundamental canon of statutory construction . . . that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*,

(continued...)

-8-

this purported rule were a canon, "canons are not mandatory rules" but, rather, are "guides [] designed to help judges determine the Legislature's intent as embodied in particular statutory language.  And other circumstances evidencing congressional intent can overcome their force."[23]

Nevertheless, Miller argues "derive" must have a different definition from "receive", and so ultimately interprets "derived during" to require that "the income at issue must originate from, or be **earned** during, the applicable six-month "look-back" period (i.e., the "specified source" or "origin" of the income)" (emphasis added).  But there is simply no basis in the statute or the dictionary definitions for interpreting "derived" as "earned," the latter being a word Miller adds to the definition without explanation.  This unjustified addition twists the meaning of the term "derived" and would fundamentally alter the CMI definition.  None of the dictionary definitions of "derive" uses the term "earn."  Even if Miller is correct that Congress generally does not use two words to mean the same thing, there is simply no basis to substitute "earned" for "derived," as Miller advocates.

Moreover, Miller's general argument, that reading two different words to mean the same thing renders portions of the statute redundant, fails in this case.  Careful consideration of this statute indicates that, even when "received" and "derived" are given the same meaning, every portion of the statute remains essential.  We note that the first portion of the statute, containing the term "receives," is in the present tense and explains what kind of income is included in a CMI calculation, without respect to its receipt.  Thus, "income from all sources that the debtor receives . . . without regard to whether such income is taxable" is

---

[22]    (...continued)
444 U.S. 37, 42 (1979).

[23]    *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (citation and internal quotation marks omitted).

included in CMI. The second part of the CMI definition sets the time period applicable to that income; the income must have been "derived during" the look-back period. When the statute is read as a whole, then, it contains no surplusage—both portions of the definition of CMI are necessary to the calculation.

After reviewing the accepted definitions for the term "derived," in the context of the phrase "derived during," the Court concludes that the phrase "income derived during the look-back period" has the plain meaning "income received during the look-back period." This reading does not raise the concerns about redundancy or surplusage sometimes associated with reading dissimilar terms to mean the same thing, and this reading directly applies the commonly accepted dictionary definition of the term "derived" to the question at hand. Because this is the only reasonable interpretation of the statutory language, the language is not ambiguous.[24]

The Court is aware of the divided case law on this question,[25] and Miller

_____

[24]     *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, No. 12-3295, 2014 WL 4069137, at *31 (10th Cir. Aug. 19, 2014).

[25]     *See, e.g.*, *In re Strickland*, 504 B.R. 542, 545-46 (Bankr. D. Minn. 2014) (holding that "current monthly income" under § 101(10A) means the amount of income earned during the six months, regardless of the date of receipt); *In re Robrock*, 430 B.R. 197, 204 (Bankr. D. Minn. 2010) (same); *In re Cruz*, No. 08-23419, 2008 WL 3346583, at *2 (Bankr. E.D. Wis. Aug. 11, 2008) (holding that "[w]hether income is included in CMI is determined by when the debtor *receives* funds, not when they are earned."), *relying on In re DeThample*, 390 B.R. 716 (Bankr. D. Kan. 2008); *In re Burrell*, 399 B.R. 620, 627 (Bankr. C.D. Ill. 2008) (holding that "derived during" was mere "surplusage adding nothing substantive to the definition" of CMI); *In re DeThample*, 390 B.R. at 721 (holding that § 101(10A) "include[s] every dime a debtor gets during the relevant period except for those amounts specifically excluded"); *In re Sanchez*, No. 06-40886, 2006 WL 2038616, at *2 (Bankr. W.D. Mo. July 13, 2006) (holding that "derived" is largely redundant of "received," meaning "to take, receive, or obtain especially from a specified source," and thus that CMI included all money received during the look-back period).

relies extensively on two prior Chapter 7 cases, *Arnoux* and *Meade*,[26] which merit additional discussion. First, Miller relies on *Arnoux*, but the definition of "derived" was not at issue in *Arnoux*, as both the Chapter 7 debtor and the UST apparently agreed that the term meant "earned." The only dispute was whether income the debtor received after the look-back period, for work performed during that period, must be included in CMI. Debtor Arnoux argued (as does Miller) that income must be both received and earned in the look-back period, whereas the trustee argued (as does the UST here) that only the term "derived" is actually limited to the look-back period. The debtor had included all income she received during the look-back period, but had excluded a two-week payment for work performed during that period, but received outside of it.

The *Arnoux* trustee argued that the "natural reading" of § 101(10A) imposed two conditions on income inclusion (only one of which was subject to a time parameter): 1) it was received by the debtor, and 2) it was "derived" (*i.e.*, earned) during the look-back period. Contrary to that trustee's plain language assertion, the *Arnoux* court determined § 101(10A) to be ambiguous.[27] It then considered the statute's legislative history, concluding that the drafters intended the look-back period to apply to both "receives" and "derived."[28] Thus, the court held that income must be both received and earned during the look-back period, so income the debtor received outside of the look-back period but earned during it was excluded from the debtor's CMI.

---

[26]   *In re Arnoux*, 442 B.R. 769 (Bankr. E.D. Wash. 2010); *In re Meade*, 420 B.R. 291 (Bankr. W.D. Va. 2009).

[27]   *In re Arnoux*, 442 B.R. at 776 (but disagreeing with the *Burrell* court's assessment that the phrase "derived during" was in the statute as the "result of poor sentence construction and inartful drafting").

[28]   *Id.*

Miller also relies on *In re Meade*[29] to support his position. In *Meade*, the principal dispute centered around whether the entire $9,000 annual bonus received by one of the debtors during the November 1, 2008 through April 30, 2009 look-back period—theoretically for work done throughout 2008—should be included.[30] As the entirety of the bonus was received during the look-back period, the trustee argued that it should all be included in calculating the debtors' CMI. The Meades countered that "a common sense approach" would be to divide the bonus into twelve months, rather than six, since it was an annual bonus.[31] Significantly, the Meades had stipulated to their above-median status, and that the statutory presumption of ability to pay their creditors arose under § 727(b)(2). As such, the specific issue in *Meade* was whether debtors' "disposable income" (CMI, less allowed expenses, times sixty) exceeded the threshold for presumption of abuse.[32]

The *Meade* court elected to include only half of the annual bonus in the debtors' CMI. It did so based in large part on the parties' agreement that the term

---

[29]     *In re Meade*, 420 B.R. at 291.

[30]     The debtor had also received a similar bonus of $9,000 in February 2008, and $8,500 in February of 2007, corroborating that the debtor's receipt of annual bonuses, in this range, was the norm.

[31]     *In re Meade*, 420 B.R. at 301. The Meades did not argue, as they might have, that the entirety of the annual bonus was "earned" in calendar year 2008, in which case, only two months of the bonus (November and December) were both "earned" (or "derived") and received during the look-back period. At most, the bonus likely was earned in only three months of the look-back period (November through January), as bonuses are not typically paid in advance. Although this argument was not made, the fact that it could have been under Miller's reading of § 101(10A) helps illustrate the UST's argument that requiring income to be both earned *and* received in the look-back period would, in many instances, increase the complexity of determining the amount of income to include in CMI. Thus, although it is ordinarily simple enough to determine when regular pay ("earned income") was "earned" as in the present case, other income, including bonuses, 401(k) distributions, and other "passive income," might be quite difficult to tie to a particular date other than when it was received.

[32]     *See* § 707(b)(2)(A)(i).

"derived," as used in § 101(10A), meant "earned." This is apparent from the court's discussion regarding the difficulty of prorating a bonus that was paid prior to the look-back period under the parties' statutory reading.[33] The court then "acknowledge[d] the conceptual difficulties" of its holding, but found them to be no greater than the problem of using past income to determine what a debtor will pay in a future repayment plan.[34] Ultimately, however, the court granted the trustee's motion to dismiss the Meades' case, finding that they had failed to rebut the statutory presumption.[35] Thus, *Meade* neither supports Miller's assertion that income must be both received and earned in the look-back period, nor does it hold that the term "derived" means "earned."

Although the statute is unambiguous, its legislative history and underlying public policy also support our interpretation of the statute. As several courts have already noted, the word "derived" was never used in the legislative history of

---

[33] The court noted that there was authority in a Chapter 13 context to include such a non-look-back period payment in CMI, citing *In re Foster*, No. 05-50448, 2006 WL 2621080 (Bankr. N.D. Ind. Sept. 11, 2006). *Meade*, 420 B.R. at 306. Because *Foster* involved facts well beyond the ones presented by the present case, we do not discuss it here.

[34] *In re Meade*, 420 B.R. at 306-07. It is significant to note that the *Meade* court did not have the benefit of the Supreme Court's 2010 decision in *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010), which held that determinations of projected disposable income should involve a "forward looking approach" that takes into consideration "known or virtually certain changes to debtors' income or expenses." Although the *Lanning* decision did not discuss the issue of "receives" and "derived" with respect to inclusion of income in CMI, its holding is at least arguably supportive of the UST's position that while all income received should be included in CMI, the continued accuracy of that income going forward may be raised by a debtor (at least in Chapter 13 cases) in connection with the determination of projected income. Thus, although the debtor in *Lanning* was treated as an above-median debtor based on her CMI, which included two significant, non-recurring buy-out payments from her former employer, the amount of her actual plan payment was based on her true income at the time of plan confirmation.

[35] One factor that led to dismissal of the Meades' case was the court's conclusion that debtor wife's school teacher salary should not be prorated over 12 months, but should instead be included in CMI as it had been actually received.

§ 101(10A), and very little was said about the statute at all.[36]  One of only two nearly identical legislative statements regarding CMI is found in a section-by-section discussion of BAPCPA's 2005 overhaul of the Bankruptcy Code:

> Section 102(b) of the Act amends section 101 of the Bankruptcy Code to define "current monthly income" as the average monthly income that the debtor receives (or in a joint case, the debtor and debtor's spouse receive) from all sources, without regard to whether it is taxable income, in a specified six-month period preceding the filing of the bankruptcy case.[37]

And as the *Burrell* court noted, "[t]he legislative history only makes reference to when income is received; nowhere is reference made to when the income is earned.  The phrase 'derived during' is completely absent."[38]  The legislative history thus supports a reading of the terms at issue here as merely synonymous.

Finally, the doctrine that we should be guided by the underlying public policy of the statute reinforces our interpretation of CMI as requiring inclusion of *all* income received by a debtor during the look-back period.  As a general matter, remedial legislation should be construed in a way that effectuates its remedial purpose:

> [R]emedial legislation, like BAPCPA, should be construed broadly to effectuate its purpose.  The means test was intended to screen Chapter 7 individual debtor filings to determine who could pay a significant portion of their debts over time. . . . BAPCPA intended to force these debtors into Chapter 13 filings if they wanted bankruptcy relief.  The impetus behind this law was to 'combat perceived fraud and abusive [Chapter 7] filings.'  Thus BAPCPA is remedial in nature.[39]

This Court is well aware of the remedial concerns BAPCPA was intended to address, and Miller is precisely the type of debtor who the drafters sought to

---

[36]     *See, e.g., In re Burrell*, 399 B.R. 620, at 627 (Bankr. C.D. Ill. 2008).

[37]     H.R. Rep. No. 109-31, at 122, *reprinted in* 2005 U.S.C.C.A.N. 88.

[38]     *In re Burrell*, 399 B.R. at  626.

[39]     *In re Gentry*, 463 B.R. 526, 530 (Bankr. D. Colo. 2011), *citing In re Kucharz*, 418 B.R.635, 642 (Bankr. C.D. Ill. 2009) and *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

screen from use of Chapter 7—higher income debtors who have the ability to repay a portion of their unsecured debt, yet seek to instead have that debt discharged.[40]

Miller receives bi-weekly salary payments, a very common employer payment method. Employees who are paid bi-weekly receive 13 paychecks in any six-month period. However, Miller's interpretation of CMI would reduce that number to 12, thereby reducing the look-back period income of all bi-weekly paid debtors by nearly 8%, since one of those payments will have been earned before the period and paid during it, while another will be earned during the period and paid after it. Reading the statute to only include 12 bi-weekly payments would be inconsistent with its purpose, as it would not fairly capture an entire six-month's worth of income. It was not Congress's intent in enacting the BAPCPA "means test" to allow debtors to distort their actual income to avoid paying a fair share of their future income to their creditors.

Thus, even if we were to hold this statute ambiguous, an analysis of the legislative history, coupled with an appreciation of the statute's remedial purpose, would dictate the same conclusion.

V.    CONCLUSION

Although both parties present persuasive arguments on this difficult issue of statutory interpretation, we conclude that the plain meaning of § 101(10A) is that the term "current monthly income" includes all income a debtor receives in the look-back period, regardless when it was earned. Even were we to conclude that the statute was ambiguous, imposition of an additional requirement—that the

---

[40]    Although the math suggests Miller might have been able to pay as much as 72% of his unsecured debt ($42,000/$58,062), the UST contends, using data from Miller's own schedules I and J, that Miller could have paid his unsecured creditors as much as 50% of their claims over a 60-month repayment plan. *See* U.S. Trustee's Analysis of the Debtor(s) Schedules I & J, *in* Appx at 73-75. Regardless whether it is 50% or 72%, it is a significant recovery for creditors.

income also be earned during the look-back period—is supported neither by the statute's language nor by legislative history, and we would ultimately define the term in the same way. Therefore, we affirm the bankruptcy court's dismissal of Miller's Chapter 7 case, pursuant to § 707(b)(2).



THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *Life* OF THE *People*

SEARCH THE SITE

SEARCH



THE UNITED STATES
DEPARTMENT *of* JUSTICE

| HOME | ABOUT | AGENCIES | BUSINESS | RESOURCES | NEWS | CAREERS | CONTACT |

Home » About DOJ » Agencies » U.S. Trustee Program » Means Testing » Means Testing (Cases Filed Between April 1, 2013, and April 30, 2013, Inclusive) » Census Bureau Median Family Income By Family Size

🖨 Printer Friendly

CENSUS BUREAU MEDIAN FAMILY INCOME BY FAMILY SIZE

✉ E-MAIL UPDATES

- U.S. Trustee Program
- About the Program
- Meet the Director
- Regions and Offices
- Private Trustee Information
- Fee Guidelines
- Consumer Information
- Credit Counseling & Debtor Education
- **Means Testing Information**
- Press & Public Affairs
- Employment Opportunities
- What's New
- Site Map
- USTP FOIA
- Contact the Program

## (Cases Filed Between April 1, 2013, and April 30, 2013, Inclusive)

The following table provides median family income data reproduced in a format designed for ease of use in completing Bankruptcy Forms 22A and 22C.

The **State Median Family Income by Family Size** data is available for download in MS Excel format. [XLSX - 14 KB]

| STATE | 1 EARNER | 2 PEOPLE | 3 PEOPLE | 4 PEOPLE * |
|---|---|---|---|---|
| ALABAMA | $40,120 | $49,163 | $52,215 | $64,700 |
| ALASKA | $53,804 | $71,624 | $82,198 | $88,373 |
| ARIZONA | $42,107 | $55,118 | $55,654 | $61,023 |
| ARKANSAS | $36,505 | $46,333 | $49,494 | $56,591 |
| CALIFORNIA | $48,415 | $63,030 | $67,401 | $75,656 |
| COLORADO | $49,549 | $65,631 | $72,259 | $86,787 |
| CONNECTICUT | $58,337 | $72,878 | $86,390 | $102,530 |
| DELAWARE | $48,284 | $62,707 | $73,284 | $85,150 |
| DISTRICT OF COLUMBIA | $50,186 | $81,960 | $81,960 | $81,960 |
| FLORIDA | $41,915 | $51,760 | $54,934 | $65,260 |
| GEORGIA | $41,214 | $51,954 | $56,189 | $67,214 |
| HAWAII | $49,919 | $63,896 | $76,001 | $84,690 |
| IDAHO | $41,785 | $49,896 | $50,506 | $62,322 |
| ILLINOIS | $47,485 | $59,861 | $68,721 | $80,776 |
| INDIANA | $42,089 | $52,618 | $58,916 | $70,763 |
| IOWA | $42,207 | $58,852 | $64,552 | $78,366 |
| KANSAS | $42,577 | $56,851 | $65,907 | $76,402 |
| KENTUCKY | $40,020 | $46,815 | $55,613 | $67,783 |
| LOUISIANA | $37,967 | $47,731 | $55,863 | $70,347 |
| MAINE | $41,488 | $53,227 | $60,425 | $79,931 |
| MARYLAND | $58,269 | $73,685 | $87,206 | $108,915 |
| MASSACHUSETTS | $55,602 | $67,443 | $82,495 | $103,624 |
| MICHIGAN | $45,029 | $52,621 | $61,715 | $73,864 |
| MINNESOTA | $48,097 | $63,654 | $76,909 | $89,126 |
| MISSISSIPPI | $36,240 | $43,095 | $46,062 | $59,248 |
| MISSOURI | $41,092 | $51,784 | $59,549 | $72,150 |
| MONTANA | $42,301 | $54,362 | $56,977 | $67,055 |
| NEBRASKA | $41,861 | $59,543 | $67,235 | $77,057 |
| NEVADA | $44,924 | $55,674 | $55,674 | $66,562 |
| NEW HAMPSHIRE | $52,588 | $65,830 | $82,924 | $99,457 |
| NEW JERSEY | $61,146 | $69,697 | $85,016 | $103,786 |
| NEW MEXICO | $38,349 | $51,965 | $51,965 | $61,617 |
| NEW YORK | $47,790 | $59,308 | $69,052 | $83,209 |
| NORTH CAROLINA | $40,710 | $51,812 | $56,339 | $64,983 |
| NORTH DAKOTA | $41,557 | $61,492 | $68,688 | $86,653 |
| OHIO | $42,814 | $53,218 | $60,960 | $74,270 |
| OKLAHOMA | $40,665 | $51,575 | $53,500 | $64,374 |
| OREGON | $43,160 | $55,057 | $62,202 | $67,315 |
| PENNSYLVANIA | $47,439 | $55,210 | $68,848 | $82,078 |
| RHODE ISLAND | $46,896 | $61,607 | $76,864 | $83,785 |
| SOUTH CAROLINA | $39,238 | $50,548 | $53,532 | $61,388 |

Footnote 2

| | 1 EARNER | 2 PEOPLE | 3 PEOPLE | 4 PEOPLE |
|---|---|---|---|---|
| SOUTH DAKOTA | $38,071 | $57,188 | $65,829 | $73,960 |
| TENNESSEE | $39,891 | $48,617 | $55,080 | $65,038 |
| TEXAS | $41,225 | $55,895 | $60,503 | $67,296 |
| UTAH | $50,976 | $56,089 | $63,430 | $66,590 |
| VERMONT | $46,019 | $61,702 | $67,774 | $85,750 |
| VIRGINIA | $53,328 | $65,930 | $77,585 | $91,661 |
| WASHINGTON | $52,724 | $65,123 | $71,289 | $83,270 |
| WEST VIRGINIA | $41,499 | $44,536 | $54,790 | $66,756 |
| WISCONSIN | $43,661 | $58,668 | $65,775 | $81,296 |
| WYOMING | $45,336 | $63,193 | $73,688 | $78,733 |

*For cases filed on or before March 31, 2013, add $7,500 for each individual in excess of 4.*
*For cases filed on or after April 1, 2013, add $8,100 for each individual in excess of 4.*

| COMMONWEALTH OR U.S. TERRITORY | FAMILY SIZE | | | |
|---|---|---|---|---|
| | 1 EARNER | 2 PEOPLE | 3 PEOPLE | 4 PEOPLE * |
| GUAM | $38,410 | $45,925 | $52,334 | $63,331 |
| NORTHERN MARIANA ISLANDS | $25,793 | $25,793 | $30,008 | $44,137 |
| PUERTO RICO | $22,392 | $22,392 | $23,537 | $28,180 |
| VIRGIN ISLANDS | $30,475 | $36,627 | $39,052 | $42,785 |

*For cases filed on or before March 31, 2013, add $7,500 for each individual in excess of 4.*
*For cases filed on or after April 1, 2013, add $8,100 for each individual in excess of 4.*

FRIDAY, SEPTEMBER 27, 2013 10:49 AM

U.S. DEPARTMENT of JUSTICE | 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

JUSTICE.GOV

**ABOUT**
The Attorney General
Budget & Performance
Strategic Plans

**AGENCIES**

**BUSINESS & GRANTS**
Business Opportunities
Small & Disadvantaged Business
Grants

**RESOURCES**
Forms
Publications
Case Highlights
Legislative Histories
Information for Victims Large Cases

**NEWS**
Justice News
The Justice Blog
Videos
Photo Gallery

**CAREERS**
Legal Careers
Interns, Recent Graduates, and Fellows
Diversity Policy
Veteran Recruitment

**CONTACT**

Site Map
Archive
Accessibility
FOIA
No FEAR Act
Information Quality
Privacy Policy
Legal Policies & Disclaimers

For Employees
Office of the Inspector General
Government Resources
Plain Writing
USA.gov
BusinessUSA

Footnote 2

# de·rive  *verb*  \di-ˈrīv, dē-\

: to take or get (something) *from* (something else)

: to have something as a source : to come *from* something

**de·rived** | **de·riv·ing**

**Full Definition of DERIVE**  g+1

*transitive verb*

**1  a:** to take, receive, or obtain especially from a specified source

**b:** to obtain (a chemical substance) actually or theoretically from a parent substance

Footnote 18